# EXHIBIT 1

DMJ:CPK
F.#2012R00759

**12-0483M**

<u>TO BE FILED UNDER SEAL</u>

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.

MAY 18 2012

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

THE PREMISES KNOWN AND DESCRIBED
AS A COMMERCIAL BUILDING, LOCATED
AT 425 NORTHERN BOULEVARD, SUITE
27, GREAT NECK, NEW YORK 11021
("SUBJECT PREMISES")

- - - - - - - - - - - - - - - -X

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

M. No._____
(T. 21, U.S.C., §§ 331(a)
 and 333(a)(2))

EASTERN DISTRICT OF NEW YORK, SS:

     THOMAS S. NASIATKA, being duly sworn, hereby states

that he is a Special Agent for the United States Food and Drug

Administration ("FDA"), duly appointed and sworn as such and

assigned to the Long Island domicile and acting as such:

     There is probable cause to believe that there is

presently located within THE PREMISES KNOWN AND DESCRIBED AS

SUITE 27 OF A COMMERCIAL BUILDING, LOCATED AT 425 NORTHERN

BOULEVARD, GREAT NECK, NEW YORK 11021 ("SUBJECT PREMISES"),

items, all of which constitutes contraband, evidence, fruits and

instrumentalities of violations of  Title 21, United States Code,

§§ 331(a) and 333(a)(2) as described in detail in Attachment A

hereto.

The source of your deponent's information and the grounds for his belief are as follows:

1.  I have been employed as a Special Agent of the FDA since 2003.  Prior to that time, I was a Secret Service Agent for 21 years.  I have personally worked for over nine years in drug related investigations.  I am presently assigned to the Long Island Domicile of the FDA's Office of Criminal Investigation ("FDA/OCI").

2.  I have the responsibility of conducting investigations involving criminal violations of the Federal Food, Drug and Cosmetic Act (hereinafter "FDCA"), codified as Title 21, United States Code (hereinafter "U.S.C.") § 301 et seq., the Prescription Drug Marketing Act (hereinafter "PDMA"), and related provisions of Title 18 of the United States Code.  During the last 9 years with FDA/OCI, I have become familiar with the federal statutes enforced and the industry regulated by the FDA. I have also investigated and become familiar with prescription drug diversion schemes, the legitimate methods of marketing and packaging of prescription drugs, and the manner in which individuals circumvent the legitimate channels of distribution to fraudulently obtain and distribute prescription drugs and drugs unapproved for sale in the United States.

3. The statements contained in this affidavit are based in part on information provided by private industry, employees of Novartis and Esai, Inc., and my experience and background as a Special Agent. Except where indicated, all statements referred to below are set forth in substance and in part, rather than verbatim. I have set forth herein only such information as I believe necessary to establish probable cause to obtain the search warrant for the location specified below. All the facts known to me as a result of my investigation have not been included.

4. This affidavit arises out of an investigation of Medical Device King ("MDK") and Pharmalogical, Inc. located at the SUBJECT PREMISES as well as the owners of said companies identified as, among others, William Liam Scully and Sharad Rodi Laneh. Based on information obtained in the investigation, MDK and Pharmalogical, Inc. have been ordering and receiving foreign drugs including cancer and chemotherapy medication such as aloxi, aredia and altuzan as well as botox and related drugs. It has been further determined that these foreign drugs have been sold and/or administered to, among others, cancer patients without their knowledge.

5. As described more fully below, foreign-market pharmaceuticals are almost always considered unapproved and

4

misbranded drugs under U.S. law, whether counterfeit or authentic. *See In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 790 (8th Cir. 2006) (holding that drugs imported from Canada are unapproved and misbranded, even if chemically identical to FDA-approved equivalents).

6. Based on the facts learned from the investigation thus far, affiant respectfully submits that probable cause exists to believe that evidence of violations of the FDCA and other federal criminal statutes may be found at the SUBJECT PREMISES, which are more fully described in Attachment B hereto.

### Legal Background

7. The FDA is the federal agency responsible for protecting the health and safety of the American public by ensuring, among other things, that drugs are safe and effective for their intended uses and bear labeling that contains true and accurate information. FDA's responsibilities include regulating the manufacture and distribution of drugs, including prescription drugs, shipped or received in interstate commerce, as well as the labeling of such drugs. FDA carries out its responsibilities by enforcing the FDCA and other pertinent laws and regulations.

8. One of Congress' goals in enacting and amending the FDCA has been to ensure the integrity of America's drug supply. Congress determined that the public interest in the purity of

5

prescription drugs and pharmaceutical products distributed to American consumers is so great as to warrant imposition of the highest standard of care on those who distribute those products to the public. Under the FDCA, the responsibility for maintaining the quality and safety of drugs is not placed on the innocent public that purchases drugs but rather on those who sell and distribute drugs. Congress has determined that consumers have a right to expect that those who distribute and dispense drugs will be vigilant and responsible in matters that affect the public health. Furthermore, consumers receiving pharmaceutical products have an expectation that the pharmaceuticals they are receiving are safe and have been approved by the FDA.

9. While the United States wholesale distribution market is highly regulated, many other markets around the world are not. Pharmaceutical distributors who circumvent United States law and illegally import foreign pharmaceuticals into the United States put their customers/patients at risk for receiving counterfeit, misbranded, and/or adulterated drugs.

10. Foreign-market pharmaceuticals generally are less expensive than the FDA-approved version. Based on information gathered in a related investigation into the purchase of foreign-market Avastin, a drug used with chemotherapy for colon and lung cancer, by United States physicians, it was determined that

physicians realize discounts of 20% or more off the price of
Avastin that is sold in the United States.  Because medical
insurance plans reimburse based on the price of the FDA-approved
version, physicians who obtain and sell foreign market Avastin
are able to change the United States market price and pocket the
difference.

   11.  Based on my training, experience and knowledge,
and discussion with others in my agency, I know the following:
Computers and computer technology have revolutionized the way in
which prescription pharmaceutical drugs are being distributed and
utilized.  It has also revolutionized the way in which illegal
prescription drug manufacturers and distributors make and
distribute misbranded drugs, counterfeit drugs, and unapproved
new drugs to other wholesalers, distributors, and end users.
Counterfeit prescription drugs, misbranded drugs, and unapproved
new drugs are often ordered using the internet and shipped from
outside the country to the customers within the United States.
Bulk shipments of counterfeit prescription drugs, misbranded
drugs, and unapproved new drugs are often shipped to wholesalers
and pharmacies in the United States.  The wholesalers and
distributors usually then either introduce the counterfeit
prescription drugs, misbranded drugs, and unapproved new drugs
into the main stream prescription drug market, or dispense the

counterfeit, misbranded or unapproved prescription drugs directly to patients.

12. The FDCA defines a "drug" to include "articles recognized in the official United States Pharmacopoeia," "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," and "articles...intended to affect the structure or any function of the body of man." 21 U.S.C. § 321(g)(1)(A), (B) and (C).

13. Prescription drugs are drugs that, because of their toxicity and other potential for harmful effects, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A). A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to administer such drug as a condition of the FDA's approval of the drug. 21 U.S.C. § 353(b)(1)(B).

14. The FDCA prohibits doing and causing the following acts:

> a. Introducing or delivering for introduction into interstate commerce any drug that is misbranded. 21 U.S.C. § 331(a).

     b. Receiving in interstate commerce a misbranded drug and
delivering or proffering delivery of such drug for pay
or otherwise.  21 U.S.C. § 331(c).

     c. Introducing or delivering for introduction into
interstate commerce any new drug that was not approved
by FDA under 21 U.S.C. § 355.  21 U.S.C. §§ 331(d),
355(a).

     15.  The FDCA defines interstate commerce as "(1)
commerce between any State or Territory and any place outside
thereof, and (2) commerce within the District of Columbia or
within any other territory not organized with a legislative
body."  21 U.S.C. § 321(b).

     16.  <u>Unapproved new drugs</u>:  A drug is a "new drug" if
it is "not generally recognized, among experts qualified by
scientific training and experience to evaluate the safety and
effectiveness of drugs, as safe and effective for use under the
conditions prescribed, recommended, or suggested in the labeling
thereof ..."  21 U.S.C. § 321(p)(1).

     17.  New drugs require an approved new drug application
("NDA") before they can lawfully be introduced into interstate
commerce.  21 U.S.C. §§ 331(d) and 355.

     18.  The purpose of an NDA is to provide the FDA with
enough information to make an approval decision.  The FDA's

decision focuses on three factors: (1) whether the drug is safe and effective for each proposed use and whether the benefits of the drug outweigh the risks; (2) whether the drug's proposed labeling (package insert) is appropriate, and what it should contain; and (3) whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity.

19. An approved NDA authorizes a sponsor to manufacture and distribute only the exact drug described in the application. Manufacturing must occur only at facilities authorized under the approved NDA; the drug may bear only the FDA-approved package insert; and the drug may be distributed by the manufacturer only for uses prescribed, recommended, or suggested in the approved labeling.

20. Drugs approved for foreign markets will almost always be unapproved drugs under United States law even if chemically identical to the United States-approved version. Foreign drugs may have different approved labeling (including different warnings, dosage recommendations, and indications for use) and may be manufactured in some place other than the location approved in the United States approval process. *See In re Canadian Import Antitrust Litigation*, 470 F.3d 785,

10

790 (8th Cir. 2006) ("Because foreign labeling differs from domestic labeling, approval granted to a particular manufacturer for a particular product to be distributed in the United States does not constitute approval of another drug—even one with the same chemical composition—to be distributed in Canada with different labeling, and then imported into the United States.")

21.   <u>Misbranded drugs—no adequate directions for use</u>: Under the FDCA, a drug is deemed to be misbranded unless its labeling bears adequate directions for use.   21 U.S.C. § 352(f)(1).   A drug shipped in interstate commerce with no labeling at all *per se* lacks adequate directions for use.

22.   Under FDA regulations, "adequate directions for use" means directions under which a layman can self-administer a drug safely and for its intended purposes.   21 C.F.R. § 201.5

23.   Unlike over-the-counter drugs—which are intended for self administration—prescription drugs by their very nature are safe for use only under the supervision of a licensed practitioner.   21 U.S.C. § 353(b)(1)(A).   Adequate directions for use, therefore, do not exist for prescription drugs.   To allow for the lawful movement of prescription drugs in interstate commerce, FDA regulations exempt prescription drugs from the adequate-directions-for-use requirement if they meet certain conditions.   21 C.F.R. 201.100.

24.   One such condition requires that labeling "on or within the package from which the drug is to be dispensed bears adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented."  21 C.F.R. 201.100(c)(1).

25.   For articles subject to the new drug approval requirement, this labeling must be the same one approved in the NDA for that drug.  21 C.F.R. 201.100(c)(2).

26.   Foreign versions of FDA-approved drugs often do not meet the exemption because the labeling approved by foreign regulatory authorities differs from the FDA-approved labeling that must accompany the product for the exemption to apply.

27.   <u>Misbranded drugs—required information not on the label</u>:  A drug is also misbranded if any word, statement, or other information required to appear on the label or labeling is not prominently placed thereon.  21 U.S.C. § 352(c).  Under FDA regulations,  a drug may be misbranded under section 352(c) unless "all words, statements, and other information required by or under authority of the act to appear on the label or labeling

shall appear thereon in the English language . . ."  21 C.F.R. 201.15.

28.  <u>Misbranded drugs—failing to bear the symbol "Rx only"</u>:  A drug is misbranded if it is a prescription drug and its label does not bear the symbol "Rx only."  21 U.S.C. § 353(b)(4).

29.  <u>Healthcare Fraud</u>:  18 U.S.C. § 1347 prohibits any person from knowingly and willfully executing or attempting to execute a scheme to defraud a health benefit program or to obtain money by false or fraudulent pretenses from a health benefit program.

30.  <u>Smuggling</u>:  18 U.S.C. § 545 prohibits, among other things, any person from fraudulently or knowingly importing any merchandise contrary to law or selling such merchandise after importation knowing that it was imported contrary to law.

Background of Investigation

31.  On February 18, 2011, I met with representatives of the New York State Education Department, Office of Professional Discipline ("NYSED/OPD"), Hauppauge, New York, who referred a case for investigation.  The NYSED/OPD handles complaints of professional misconduct and illegal practices of licensed professionals as well as those practicing without a

license.   They received the below described complaint from the
New York State Board of Pharmacy.

32.   An unidentified complainant to the New York State
Board of Pharmacy advised that they had received an unsolicited
fax, Attachment C hereto, from Medical Device King offering
oncology and rheumatology medications for sale at prices
unavailable in the traditional market.   This solicitation
provided Medical Device King's contact number as (877) 321-5567.

33.   A New York State Board of Pharmacy representative
acting in an undercover capacity made a telephone call to Medical
Device King at (877) 321-5567 and was advised to call (516) 439-
5376.   The caller was told that Medical Device King was
affiliated to the company Pharmalogical, Inc., a licensed drug
wholesaler in the State of New York.   The undercover caller
inquired as to how Medical Device King could sell the advertised
drugs at the prices offered and was told that they could offer
these prices, as Medical Device King had no sales force and
shipped the drugs from overseas, as the company itself was
located in the United Kingdom.

34.   Subsequently, a NYSED/OPD representative acting in
an undercover capacity made a telephone call to Medical Device
King at (877) 321-5567, left a message, and was later contacted
by an individual who identified himself as Shahrad Rodi Lameh.

When asked about the discounted prices, Lameh advised that these prices could be offered because they purchased drugs from manufacturers all over the world, except Canada.

35.   In response to the above information and after confirming that Pharmalogical, Inc. was licensed with their Office, NYSED/OPD investigators attempted to conduct a site inspection at Pharmalogical, Inc., 425 Northern Blvd., Suite 27, Great Neck, NY 11021.  Upon arrival, they requested to speak with William Scully, the President of the company, but was told that he was not available.  The investigators left the location and were later called by Scully.  Scully confirmed that Pharmalogical, Inc. sells "chemo drugs" and would provide supporting invoice and shipping documents as requested by the investigators.  Scully never provided these documents and did not return messages left for him.

36.   The NYSED/OPD provided the following documents to me upon referral:

a.   A copy of the Medical Device King sales solicitation and "Account Set up Form" that was provided by the complainant, as this was the unsolicited fax received (Attachment C hereto). A copy of The University of the State of New York, The State Education Department, Office of the Professions, New York State Board of Pharmacy form titled "APPLICATION FOR ENDORSEMENT OF

REGISTRATION OF MANUFACTURER, REPACKER AND/OR WHOLESALER OF

DRUGS, PRESCRIPTION DEVICES OR MEDICAL GASES" This form was

submitted on behalf of Pharmalogical, Inc. to report a change of

address from 1010 Northern Blvd., Suite 7, Great Neck, New York

11021 to 425 Northern Blvd., Suite 27, Great Neck, New York

11021.  This form was signed and dated on October 17, 2010 by

"William J. Scully," who is listed as the President on this

document.  "Shahad Rodi Lameh," the individual spoken to at

Medical Device King, was listed as the Vice President of

Pharmalogical, Inc. (Attachment D hereto).

b.  A copy of The University of the State of New York, The State

Education Department, Office of the Professions, New York State

Board of Pharmacy ("NYSBOP") form titled "M/W INFORMATION FORM,"

Exhibit E hereto.  This form was also submitted on behalf of

Pharmalogical, Inc., 425 Northern Blvd., Suite 27, Great Neck,

New York 11201" (the correct zip code is 11021).  This document

was also submitted to the NYSBOP to notify them of the change of

location from the previous address of 1010 Northern Blvd., Great

Neck, NY 11021.  This document, also signed on October 17, 2010,

by "William J. Scully," indicated that 100% of his business would

be operated from the 425 Northern Blvd., Suite 27 location and

that the nature of his registration was as a "Wholesaler Only" of

prescription drugs, hypordermic syringes and needles, and medical

devices.  This document also contained a floor plan, marked
"Exhibit A," of Suite 27 at 425 Northern Blvd, Great Neck, New
York (Attachment E).

37.  On February 23, 2011,  I accessed the New York
State Division of Corporations website and confirmed that
Pharmalogical, Inc. was registered as a Domestic Business
Corporation in Suffolk County, New York on August 24, 2004.  I
made an inquiry for Medical Device King at that time and I made
another inquiry on May 8, 2012.  At both times, there was no
information on Medical Device King.

38.  On February 23, 2011,  I accessed the websites for
Pharmalogical, Inc. (www.pharmalogicalinc.com) and Medical Device
King (www.medicaldeviceking.com).  The Pharmalogical, Inc.
website offered for sale the advertised supplement "Fibrosolve"
and the dermal fillers "Botox" and "Surgiderm."  The address "425
Northern Blvd., Suite 27, Great Neck, NY 11021" was listed as the
address for Pharmalogical, Inc.  The Medical Device King website
advised that Medical Device King was "Coming Soon" and offered
for sale the advertised dermal fillers "Juviderm", "Surgiderm"
and "Botox."  No cancer or rheumatology drugs were offered for
sale on either website.

39.  The Domain Registrant for
www.pharmalogicalinc.com, a domain name created on November 22,

2004, is Pharmalogical, Inc., 1010 Northern Blvd., Great Neck, New York 11021.   The Administrative and Technical Contacts are Liam Scully, Pharmalogical, Inc., 1010 Northern Blvd., Great Neck, New York 11021.

40.   The Domain Registrant for www.medicaldeviceking.com, a domain name created on April 6, 2010, is Domains by Proxy Inc.   I learned that the non-public contact information for "medicaldeviceking.com" is MDK, 425 Northern Blvd., Great Neck, New York 11021, (516) 439-4974, medev1@yahoo.com.

<u>Sales of Misbranded, Unapproved Cancer Drugs</u>

41.   On July 7, 2011,  I again accessed the Medical Device King website (www.medicaldeviceking.com) and learned that the site had been updated so that the products offered for sale included 52 different oncology drugs.

42.   On September 16, 2011,  I learned from an industry representative that a private investigator, as part of a private company's investigation, had purchased two 5ml vials of Aloxi, an FDA approved prescription cancer medication, from Medical Device King's website.   The price of $140.00 per 5ml vial was below the established wholesale price of $371.00 per vial in the United States.

43.   The Aloxi was received on or about September 13, 2011.   The Aloxi boxes and vials appeared to be labeled for distribution in Turkey, as they were labeled in Turkish.   A National Drug Code ("NDC") number, which all FDA approved drugs have, was not present on any of the drug boxes or vials.   The return address information printed on the UPS label was:

LISA MINGELLI
877-321-5567
MDK
425 NORTHERN BLVD. STE. 27
GREAT NECK, NY 11021

44.   On September 22, 2011, I learned that other FDA/OCI offices had ongoing investigations of Pharmalogical, Inc. and Medical Device King, as they sold unapproved Botox to medical facilities in their districts.   Several undercover purchases had been made and it was determined, as in this case, that the Botox manufactured by Allergan was for foreign market distribution only.

45.   SA Peter Orlando of the New Orleans Resident Office of FDA/OCI conducted surveillance at 425 Northern Blvd., Great Neck, New York on May 12, 2011, and located employee vehicles parked in spaces reserved for Pharmalogical employees. I made inquiries with the New York State Department of Motor Vehicles ("DMV") about vehicles that had been seen parked in

these reserved spaces and learned that one was registered to William J. Scully and another to Lisa M. Mongelli.

46. On November 28, 2011, I directed another FDA-OCI Special Agent to access the Medical Device King website to conduct an undercover credit card purchase of 4 vials of Aloxi 0.25mg. An account was set up using an undercover pharmacy name and address in Madison, New Jersey. The total cost of this credit card purchase was $560.00. An email confirmation was received from medev1@yahoo.com to confirm this order. This email address was listed in the Domain Registrant information for Medical Device King.

47. On December 6, 2011, I received the ordered package of 4 vials of Aloxi using the undercover pharmacy name and address in Madison, New Jersey. The package was shipped to me via UPS tracking# 1Z0469YE0197065231. The sender information contained on the shipping label was:

LISA MINGELLI
877-321-5567
MDK
425 NORTHERN BLVD. STE. 27
GREAT NECK, NY 11021

48. The box contained the 4 vials of Aloxi, each packages in its own box with an informational insert. I learned that the labeling on the box, vial, and insert were all in the Turkish language. No English language was contained on these

items.  Medical Device King Invoice #1375, dated November 29,
2011, was contained in the package.  The 425 Northern Blvd., Ste
27, Great Neck, New York address appeared on the invoice

49.  On December 6, 2011, I contacted James Dahl,
Global Product Security Director, Esai, Inc., who was provided
the lot numbers and expiration dates contained on the above 4
bottles of Aloxi so that they could be traced from manufacture to
consumer.  Three vials contained the lot# 31002405 and expiration
date of March, 2014.  The other vial contained the lot# 31001703
and expiration date of February, 2014.  Esai, Inc. has licensed
the exclusive rights for distribution of Aloxi in the United
States from the manufacturer, Helsinn Birex Pharmaceuticals,
Ltd., Damastown Mulhuddart, Dublin 15, Ireland.  Dahl reported
that the lot numbers contained on the Aloxi I received were
shipped from Helsinn to their Turkish representative, known as
"Onko," for distribution during August 2011.  Presumably, Onko
then sold these lots to their customers in Turkey (ie.
wholesalers, hospitals, clinics, doctors).

50.  On February 22, 2012, I directed another FDA-OCI
Special Agent to access the Medical Device King website to
conduct an undercover credit card purchase of 3 kits of Aredia
30mg (4 vials per kit) for $175.00 each.  The account previously
set up for the November 28, 2011 order was accessed to place this

order again using the FDA-OCI undercover pharmacy name and address in Madison, New Jersey. The total cost of this order was $555.00, which included $30.00 shipping. An order confirmation was received from Medical Device King's email address medev1@yahoo.com.

51. On March 14, 2012, upon non-receipt of the ordered Aredia, I directed another Special Agent to access the undercover email account used to place the order and learned that a message was received on February 28, 2012, from "Liam Scully." The message said "Currently we can get the 90mg of Brand Aredia for $525.00, if you are ok with it I will go ahead and order it for you. Let me know what you think, and if you want to call feel free too. Thank you. Best Regards, Liam Scully." An email response was sent to go ahead and order the 90mg of Brand Aredia.

52. The FDA issued the following statement on April 3, 2012 concerning a cancer drug:

The U.S. Food and Drug Administration is alerting healthcare professionals that another cancer drug, originating from a foreign source and purchased by U.S. medical practices, has been determined to be counterfeit. Medical practices that purchase and administer illegal and unapproved foreign medications are putting patients at risk of exposure to drugs that may be fake, contaminated, improperly stored and transported, ineffective, and dangerous. Illegal drugs purchased from foreign sources may not be genuine or meet appropriate quality, safety, and efficacy standards, putting patients at risk and depriving them of proper treatment.

Patients receiving cancer drugs or other drugs not approved by the FDA for the U.S. market may not be receiving needed therapy. Patients are encouraged to discuss any concerns they may have about the source of their medications with their healthcare professional.

FDA lab tests have confirmed that a counterfeit version of Roche's Altuzan 400mg/16ml (bevacizumab), an injectable cancer medication, found in the U.S. contains no active ingredient. **Even if the identified drugs were not counterfeit, Altuzan is not approved by FDA for use in the United States (it is an approved drug in Turkey).**

On February 14, FDA issued an alert about another cancer drug in U.S. distribution that was purchased from a foreign source and found to be counterfeit.

Medical practices obtained the counterfeit Altuzan and other unapproved products through foreign sources, in particular from Richards Pharma, also known as Richards Services, Warwick Healthcare Solutions, or Ban Dune Marketing Inc (BDMI). Many, if not all, of the products sold and distributed through this distributor have not been approved by the FDA.  The agency cannot ensure that the manufacture and handling of these illegal products follows U.S. regulations, nor can FDA ensure that these drugs are safe and effective for their intended uses.

*Any medical practice that has obtained unapproved products, in particular from Richards Pharma, Richards Services, Warwick Healthcare Solutions, or Ban Dune Marketing Inc (BDMI), should stop using them and contact the FDA.  The products should be retained and securely stored until further notice by the FDA.*

*Healthcare professionals and patients should report adverse events related to the use of suspect injectable cancer medicines to the FDA's MedWatch Safety Information and Adverse Event Reporting Program either online, by regular mail, by fax, or by phone. Health care professionals and consumers can either:*

*Complete and submit the report online:*

*www.fda.gov/MedWatch/report.htm3, or*

*Download form4 or call 1-800-332-1088 to request a reporting form, then complete and return to the address on the pre-addressed form, or submit by fax to 1-800-FDA-0178.*

*FDA is asking the public to report suspect counterfeit products
and other suspect products obtained from Richards Pharma,
Richards Services, Warwick Healthcare Solutions, Ban Dune
Marketing Inc (BDMI), or other sources:*

*Call FDA's Office of Criminal Investigations (OCI) at 800-551-
3989, or*

*Visit OCI's Web site
(www.accessdata.fda.gov/scripts/email/oc/oci/contact.cfm5), or*

*Email - DrugSupplyChainIntegrity@fda.hhs.gov*

53.  In response to the above warning, FDA/OCI
initiated several cases to identify the buyers of Altuzan.  One
such investigation was opened in the FDA/OCI's San Francisco
Resident Office.  The Sierra Nevada Cancer Center ("SNCC"),
located in Carson City, Nevada, was identified as possibly
purchasing counterfeit Altuzan from Quality Specialty Products
("QSP"), located in Canada.  During interviews conducted at SNCC,
it was learned that in addition to buying foreign labeled drugs
from QSP, SNCC had also purchased foreign labeled drugs from
Medical Device King.

54.  During a visit to SNCC on April 3, 2012, SNCC
surrendered 9 vials of the cancer medication Mabthera which was
identified as purchased from MDK.  Some of the vials of Mabthera
had foreign language labeling and some had stickers covering the
foreign language labeling.  SNCC also surrendered 7 vials of
Altuzan 400mg, which also contained foreign labeling.  SNCC
provided 30 available invoices of purchases from Medical Device

King, dated June 6, 2011 to March 8, 2012.   Each invoice was

issued by:

MDK
Medical Device King
425 Northern Blvd., Ste 27
Great Neck, NY
877-321-5567

Invoice# 483, dated June 6, 2011, bore the fax header at the top

of the invoice "Jun 16 11 12:38p Pharmalogical, Inc. 5164394975."

55.   Forty-two vials of Altuzan were sold to SNCC by

Medical Device King.   Medical Device King's website promotes the

Oncology Product Altuzan 400mg/16ml 1 vial for sale.

56.   On April 12, 2012, due to non-receipt of the

Aredia ordered from Medical Device King on February 22, 2012 and

the subsequent email ok to order directed to "Liam Scully" on

March 14, 2012, I had another Special Agent telephone MDK at

(877) 321-5567, the telephone number used on the shipping label

of packages from MDK.   I directed the agent to inquire about the

delay and the desire to complete the order for Aredia.   These

conversations, with an individual who identified herself as

"Courtney," were recorded.   Subsequent status email conversations

took place between me, utilizing an undercover email account and

Courtney from MDK, identified as "Courtney Fitt

cfitt@pharmalogicalinc.com."   In an email I sent to

cfitt@pharmalogicalinc.com. On April 15, 2012, I amended my

pending order to include 1 vial of Aloxi .25mg, in addition to the Aredia I was expecting. On April 30, 2012, "Courtney" emailed me to advise that the order was sent to me and that I should have it the next day.

57. On May 3, 2012, I received the order from Medical Device King which was shipped to my undercover mail drop in Madison, New Jersey. The UPS label identified the shipper as:

Shipping Dept.
(516) 439-5376
MDK
425 Northern Blvd.
Great Neck, NY 11021

Packing tape surrounded the mailing package which had the printed information "MDK", "Medical Device King", "1-877-321-5567", "1-480-247-5553" and www.medicaldevice.com.

58. The package contained 1 vial of Aredia 90mg and one bottle of Aloxi. The drug boxes, vials and inserts for each were labeled in Turkish. A National Drug Code (NDC) number, which all FDA approved drugs have, was not present on any of the drug boxes or vials.

59. A representative of Novartis, the manufacturer of Aredia, was contacted and provided the lot number and expiration date noted on the drug box. Novartis confirmed that the lot number and expiration date was legitimate and assigned to the

Aredia in my possession, but unapproved for sale in the United States, as it was intended for distribution in Turkey.

60. A representative of Esai, Inc., the licensed distributor of Aloxi in the United States, was also contacted and provided the lot number and expiration date on the drug box. Esai, Inc. confirmed that the lot number and expiration date were assigned to the Aloxi manufactured by Helsinn, but this too was labeled for distribution in Turkey only.

61. On May 7, 2012, I responded to 425 Northern Blvd., Great Neck, New York and confirmed the existence of Pharmalogical, Inc. in Suite 27. It appears that Pharmalogical, Inc. and Medical Device King are operated by the same individuals at the same Great Neck, New York location to be searched.

## STATEMENT REGARDING ANTICIPATED SEARCH PROCEDURES

62. As set forth in Attachment A, this affidavit seeks permission to search and seize, among other things, all foreign labeled pharmaceuticals and all documents relating to their purchase and sale. Throughout the search, agents will physically inspect all drugs for signs of foreign labels and rely on FDA/OCI's experience in similar investigations to distinguish between legitimately-acquired and illicitly-acquired pharmaceuticals.

63.   Foreign-market drugs bear numerous facial characteristics that distinguish them from FDA-approved products and that agents will look for to evaluate whether drugs encountered during the search fall within the scope of the warrant.   These facial characteristics include, among other things:

      a. Foreign language on the box

      b. Foreign language on the package insert

      c. Absence of the term "Rx only"

      d. Presence of terms like "Pr," the Canadian equivalent of "Rx only"

      e. Statements that the drug was "imported by" an entity in a foreign country

      f. Absence of an NDC number

      g. Absence of the word "lot" on the box (foreign versions typically use the term "batch" or "bn"

64.   All FDA-approved drug products are listed in the FDA Orange Book of Approved Drug Products (electronic version available at http://www.accessdata.fda.gov/scripts/cder/ob/default.cfm) and on the FDA's website at Drugs@FDA (electronic version available at http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm). Agents may also consult these sources during execution of the

warrant should a question arise about a particular drug's approval status.

65.  Based upon the facts set forth herein, as well as upon investigative experience this affiant has derived from investigating these types of cases, individuals and businesses involved in the purchase, receipt, and distribution of counterfeit and/or diverted prescription drugs and the distribution of regulated prescription drugs, routinely maintain records and related correspondence pertaining to their illegal enterprise.  These records are routinely in the form of business ledgers, sales invoices, sales receipts, customer lists, supplier lists, financial ledgers, pedigrees, and correspondence files. It is the experience of this affiant that such records are maintained in both hard copy and in computer generated files. Accordingly, this affiant submits that there exists probable cause to believe that evidence in the form of business records, correspondence, computer equipment, computer records, and other business records (as more fully described in Attachment A) that contain information relevant to the crimes set forth herein are presently located within the SUBJECT PREMISES.  Accordingly, FDA/OCI is hereby requesting the issuance of a search warrant for these premises, said searches to include all rooms, offices, attics, computer hardware and software, credenzas, desks,

bookshelves, filing cabinets, tables, safes, and all other furnishings.

66. This affiant is also requesting that all the aforementioned computer equipment and records, including all hardware, software and manuals be examined by a qualified computer evidence recovery specialist to accurately retrieve the computer data "on-site" for subsequent forensic analysis in a controlled environment. When possible, on site retrieval of computer data may be used to minimize disruption of operations.

67. As described above and in Attachment A, this application seeks permission to search and seize records that might be found in the search location in whatever form they are found. I submit that if a computer or electronic medium is found on the premises, there is probable cause to believe those records will be stored in that computer or electronic media, for at least the following reasons:

   a. Based on my knowledge, training, and experience, this affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be

recovered months or years later using readily-available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

68. Based upon my knowledge, training and experience, this affiant knows that searching for information stored in computers often requires agents to seize most or all electronic

storage devices to be searched later by a qualified computer
expert in a laboratory or other controlled environment.  This is
often necessary to ensure the accuracy and completeness of such
data, and to prevent the loss of the data either from accidental
or intentional destruction.  Additionally, to properly examine
those storage devices in a laboratory setting, it is often
necessary that some computer equipment, peripherals,
instructions, and software be seized and examined in the
laboratory setting.  This is true because of the following:

     a. The volume of evidence.  Computer storage devices (like
hard disks or CD-ROMs) can store the equivalent of
millions of pages of information.  Additionally, a
suspect may try to conceal criminal evidence; he or she
might store it in random order with deceptive file
names.  This may require searching authorities to
peruse all the stored data to determine which
particular files is evidence or instrumentalities of
crime.  This sorting process can take weeks or months,
depending on the volume of data stored, and it would be
impractical and invasive to attempt this kind of data
search on-site.

     b. Technical requirements.  Searching computer systems for
criminal evidence sometimes requires highly technical

processes requiring expert skill and properly·
controlled environment.  The vast array of computer
hardware and software available requires even computer
experts to specialize in some systems and applications,
so it is difficult to know before a search which expert
is qualified to analyze the system and its data.  In
any event, however, data search protocols are exacting
scientific procedures designed to protect the integrity
of the evidence and to recover even "hidden," erased,
compressed, password-protected, or encrypted files.
Because computer evidence is vulnerable to inadvertent
or intentional modification or destruction (both from
external sources and from destructive code imbedded in
the system as a "booby trap"), a controlled environment
may be necessary to complete an accurate analysis.

        69.  In light of these concerns, I hereby request the
Court's permission to seize the computer hardware (and associated
peripherals) that are believed to contain some or all of the
evidence described in the warrant, and to conduct an off-site
search of the hardware for the evidence described, if, upon
arriving at the scene, the agents executing the search conclude
that it would be impractical to search the computer hardware on-
site for this evidence.

70.   Searching computer systems for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.   In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant.   In light of these difficulties, your affiant intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## REQUEST FOR SEALING OF AFFIDAVIT

71.   Affiant hereby requests to have this affidavit and application sealed.   This affidavit is part of a covert investigation into the sale of, among other things, unapproved

cancer drugs. Revealing the affidavit at this time could possibly jeopardize the government's ongoing investigation be causing the destruction of evidence.

### CONCLUSION

72. For the reasons set forth above, this affiant submits that there exists probable cause to believe that evidence and/or instrumentalities of the criminal offenses described above in this affidavit may be found at Medical Device King and Phamalogical, Inc., 425 Northern Boulevard, Suite 27, Great Neck, New York.

WHEREFORE, this Affiant respectfully requests a search warrant authorizing the search of the business premises of the SUBJECT PREMISES, as more fully described in Attachment B, and the seizure of any and all evidence within the scope of Attachment A.

THOMAS S. NASIATKA
SPECIAL AGENT, FDA

Sworn to before me this 18th
day of May 2012.

HONORABLE WILLIAM D. WALL
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

(1) Foreign labeled prescription drugs including,
but not limited to aloxi, aredia and altuzan;
(2) Drugs unapproved for use in the United States by the FDA;
(3) Currency, foreign currency, negotiable instruments, precious
metals and other assets used to purchase drugs unapproved for use
in the United States by the FDA or which represent the proceeds
of the sales of such drugs;
(4) business and personal financial records, under control of
MEDICAL DEVICE KING and/or PHARMALOGICAL, INC. including, devices
and programs necessary to access such information including, but
not limited to: credit or debit cards, bank records, money
orders, wire transfer records or receipts, financial instruments,
financial transaction records, cashier's checks, traveler's
checks, money drafts, related financial records, business and
personal tax returns, money wrappers and currency counting
machines/devices, including all financial records and other
documents showing income or expenditures, such as credit card
receipts, electric bills, telephone bills, property deeds,
vehicle registrations and titles, and/or other items evidencing
the procurement, concealment, and/or transfer and expenditure of
funds and currency, and documentation concerning the purchase and
sale of drugs;
(5) documents relating to telephonic records, in handwritten and
electronic form, including computers, personal devices, cellular
and computerized telephones, answering machines and/or beepers
with numbers stored in and relayed to such devices;
(6) Photographs and/or video tapes of, in particular, assets
and/or co-conspirators;
(7) records relating to the existence of and/or rental of storage
facilities and/or safe deposit boxes and keys to safe deposit
boxes;
(8) passports; and
(9) safes, containers and cabinets, locked or unlocked,
containing items described above and all documents, keys or other
modes necessary to access such storage areas, safes and cabinets,
locked or unlocked, containing items described above.

ATTACHMENT  B

## DESCRIPTION OF PREMISES TO BE SEARCHED

Suite 27 is located on the second floor of a three floor office building at 425 Northern Boulevard, Great Neck, New York 11021.  Suite "27" appears on a metal plate affixed to the entrance door, as well as a second metal plate with the name "Pharmalogical, Inc." affixed to the door.

Pharma Marketing INC. com 

**MEDICAL DEVICE KING**

CALL: 877-821-5567    Lisa

Email: MDK@medicaldevicetking.com

MDK a leading supplier of medical devices and specialty pharmaceutical products, is offering significant savings to physicians and medical offices of up to 75% on all inventories.

We offer the lowest prices and fast delivery on all orders. We beat the competitor's prices upon verification. We also offer special pricing on all bulk quantity orders.

Please call for more information. Place your order today by filling out this form and faxing it back to 480-247-5553

We carry a large selection of specialty pharmaceutical products and medical devices. In the event that you do not see the products you want listed below please call: 877-821-5567

| Oncology / Rheumatology Products | | | Price |
|---|---|---|---|
| Gemzar 200mg-68 | ✗ | 148.15 | $71.00 |
| Gemzar 1G-85 | ✗ | 748.66 | $149.00 |
| Aloxi-60 | | | $104.00 |
| Eloxatin50mg | ✗ | 980.55 | $142.00 |
| Zometa 4mg-90 | ✗ | 836.40 | $75.00 |
| Rituxen 100mg | | | $343.00 |

**PLEASE FAX TO: 480-247-5553**

### Account Set up Form

Doctor License Number and State: _____

Company Name: _____    Contact Person: _____

Address: _____    Suite: _____

City: _____    State: _____    Zip: _____

Phone #: _____    Fax # : _____    E-mail: _____

Name on Card: _____    Card Type: Visa___ MC___ Amex___ Discover___

Mailing Address: _____

Credit Card Number: _____

Expiration Date: _____    Security Code: _____

Payment Authorization and Consent: _____

By completing and transmitting this account setup form with MDK, I hereby authorize MDK to establish a customer account so that I may place and receive orders for additional products/supplies. I agree that these products will be held by MDK on my behalf and forwarded to me at my request at a destination of my choosing. If I am paying I authorize MDK to bill my credit card for the amount of the order which will include any applicable shipping/handling fees. I further understand that I am not responsible for any unauthorized charges unless otherwise agreed to.

Name: _____    Signature of Cardholder: _____    Date: _____

** we are U.S. demand and reserved

To opt out from future faxes go to www.removemynumber.com and enter PIN# 15996, or call 877-236-5812. The recipient may make a request to the sender not to send any future faxes and their failure to comply with the request within 30 days is unlawful.

The University of the State of New York
**THE STATE EDUCATION DEPARTMENT**
Office of the Professions
New York State Board of Pharmacy
89 Washington Avenue
Albany, NY 12234-1000
Phone 518-474-3817 ext 130
E-mail pharmbd@mail.nysed.gov

**Lawrence H. Mokhiber**
*Executive Secretary*

**Department Use Only**

## APPLICATION FOR ENDORSEMENT OF REGISTRATION OF MANUFACTURER, REPACKER AND/OR WHOLESALER OF DRUGS, PRESCRIPTION DEVICES OR MEDICAL GASES

This form may be used only for change of location and/or change of name authorized by the New York State Department of State

☐  | P 2 | $170 | R E

Registration Number  02 9518

Current Registered Period  8/09

Expiration Date  7/12

Date of Endorsement _____

Approved _____

Date: _____

**1** Name under which registration has been issued or is sought

P H A R M A L O G I C A L   I N C

**2** Previous Address   Street and Number   1 0 1 0   N O R T H E R N   B L V D
STE 7
City   G R E A T   N E C K
State   N Y   County   M A S S A U
Zip Code   1 1 0 2 1

New Address   Street and Number   4 2 5   N O R T H E R N   B L V D
STE 77
City   G R E A T   N E C K
State   N Y   County   M A S S A U
Zip Code   1 1 0 2 1

**3** If a change in name, under what name is this establishment currently registered? Examine the registration certificate

Registration number: _____
Date: _____ / _____ / _____

**4** ☑ Address change.   Date. _____ / _____ / _____
☐ Address change due to fire   Temporary _____   Permanent _____
☐ Other (explain)   BETTER COST _____

**5** Trade name or assumed name of firm, if any (Only assumed names registered with the County Clerk or New York State Department of State are acceptable)

**6** (a) Type of Registrant   Type of Wholesaler   (b) County  Nassau

☐ Manufacturer   ☑ Full Line   (c) Telephone  516 439 4974
☐ Repacker – Drugs   ☐ Domestic Broker   (d) Fax  516 439 4975
☐ Repacker – Medical Gases   ☐ Import/Export Broker   (e) E-mail _____
☑ Wholesale (Distributor)   ☐ Reverse Distributor
☐ Specialty   (f) Federal Employer ID # _____

**7** Please indicate type of ownership:

☐ Individual   ☑ Corporation for profit   ☐ LLC for profit   ☐ Partnership/LLP for Profit   ☐ Government owned
☐ Corporation not-for-profit   ☐ LLC not-for-profit   ☐ Partnership/LLP not-for-profit

Form M/W 102, Page 1 of 4, (Rev. 9/08)



**8** Name the supervisor who will be responsible for the supervision of the activities to be conducted by the registrant. **Note:** If name of supervisor is different from the registration certificate, also complete Forms M/W 104 and M/W 105 for a change.

Name of Supervisor _William J. Scully_

Date of Birth _3_ / _5_ / _1969_

If Pharmacist: License Number _____ State _____ Date of License _____ / _____ / _____

If Respiratory Therapist: License Number _____ State _____ Date of License _____ / _____ / _____

**9** How many hours a week is this establishment open for business? _40 +_ _____

**10** Indicate classes of drugs manufactured, distributed, prepared, propagated, compounded, or processed and type of operation performed on each class.

| CLASS OF DRUG (check applicable boxes) | TYPE OF REGISTRANT | | |
|---|---|---|---|
| | MANUFACTURER | REPACKER | WHOLESALER |
| Prescription drugs (excluding medical gases) | ☐ | ☐ | ☑ |
| Controlled Substances | ☐ | ☐ | ☐ |
| Nonprescription drugs | ☐ | ☐ | ☑ |
| Veterinary drugs | ☐ | ☐ | ☑ |
| Vitamins | ☐ | ☐ | ☑ |
| Crude drugs, botanicals, medicinal chemicals | ☐ | ☐ | ☐ |
| Serums, toxins, vaccines and similar biologicals | ☐ | ☐ | ☐ |
| Devices, hypodermic syringes, needles, etc. | ☐ | ☐ | ☑ |
| Compressed medical gases | ☐ | ☐ | ☐ |
| Medicated cosmetics | ☐ | ☐ | ☐ |
| Other – Specify | | | |

**11** Check all that apply:    Is this location also registered as a:   ☐ pharmacy   ☐ manufacturer   ☑ wholesaler   ☐ repacker

If yes, name. _____

Does the applicant, individual owner, partner, officer or principal stockholder have financial or ownership interest in any New York State registered:
☐ pharmacy   ☐ manufacturer   ☐ wholesaler   ☐ repacker

If yes, list any/all registered pharmacy/manufacturer/wholesaler/repacker that the applicant, individual owner, partner, officer or principal stockholder has interest in. (Attach a list if necessary.)

_____ Registration number: _____

_____ Registration number: _____

_____ Registration number: _____

**12** MORAL CHARACTER

The following questions pertain to any owner or corporate officer of the establishment or registrant.

(a) Have you ever been found guilty after trial, or pleaded guilty, no contest, or nolo contendere to a crime (felony or misdemeanor) in any court?   ☐ YES   ☑ NO

(b) Are criminal charges pending against you in any court?   ☐ YES   ☑ NO

(c) Has any licensing or disciplinary authority refused to issue you a license or ever revoked, annulled, cancelled, accepted surrender of, suspended, placed on probation, refused to renew a professional license or certificate held by you now or previously, or ever fined, censured, reprimanded or otherwise disciplined you?   ☐ YES   ☑ NO

(d) Are charges pending against you in any jurisdiction for any sort of professional misconduct?   ☐ YES   ☑ NO

(e) Have you ever willfully failed to provide records to any State Licensing authority or to Federal, State or Local law enforcement officials that are required by Federal, State or Local laws?   ☐ YES   ☑ NO

If yes, please explain _____

_____

(f) Has any hospital or licensed facility restricted or terminated your professional training, employment, or privileges or have you ever voluntarily or involuntarily resigned or withdrawn from such association to avoid imposition of such measures?   ☐ YES   ☑ NO

**NOTE:** If you answer "Yes" to any questions (a) through (f), submit a letter giving complete explanation. Include copies of any court records, and if you possess one, a copy of the "Certificate of Relief from Disabilities" or your "Certificate of Good Conduct."

**13** | Give full name and requested information for **each corporate officer, partner or member**. Check the box of the new officer. USE ADDITIONAL SHEET IF NECESSARY.

☐ Title _PRESIDENT_     Last four digits of their Social Security Number: 8 0 7 9

Full name _William J Scully_

Home address (street/city/state/zip) _35 MARIDON LANE   COMMACK, NY 11725_

Home telephone number: _651-864-6171_     Licensed Pharmacist? ☐ YES ☑ NO     License # _____

☑ Title _VICE PRESIDENT_     Last four digits of their Social Security Number: 3 2 2 6

Full name _SHAHRAD RODI LAMEH_

Home address (street/city/state/zip) _____

Home telephone number: _____     Licensed Pharmacist? ☐ YES ☐ NO     License # _____

☐ Title _____     Last four digits of their Social Security Number: ☐☐☐☐

Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Licensed Pharmacist? ☐ YES ☐ NO     License # _____

☐ Title _____     Last four digits of their Social Security Number: ☐☐☐☐

Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Licensed Pharmacist? ☐ YES ☐ NO     License # _____

**14** | **a.** Give full name and requested information for each **owner or principle stockholder** (owning 10% or more of corporate stock). Check the box of the new owner or stockholder. USE ADDITIONAL SHEET IF NECESSARY.

**b.** Is this a public owned corporation? ☐ YES ☑ NO **c.** If this is a "not for profit" corporation, omit number 14

☐ Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Last four digits of their Social Security Number: ☐☐☐☐

Licensed Pharmacist? ☐ YES ☐ NO License # _____     # of shares owned _____ shares owned _____%

☐ Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Last four digits of their Social Security Number: ☐☐☐☐

Licensed Pharmacist? ☐ YES ☐ NO License # _____     # of shares owned _____ shares owned _____%

☐ Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Last four digits of their Social Security Number: ☐☐☐☐

Licensed Pharmacist? ☐ YES ☐ NO License # _____     # of shares owned _____ shares owned _____%

☐ Full name _____

Home address (street/city/state/zip) _____

Home telephone number: _____     Last four digits of their Social Security Number: ☐☐☐☐

Licensed Pharmacist? ☐ YES ☐ NO License # _____     # of shares owned _____ shares owned _____%

**UNDER TITLE 21 OF THE CODE OF FEDERAL REGULATIONS PART 250.6: THE STATE LICENSING AUTHORITY SHALL HAVE THE RIGHT TO DENY A LICENSE TO ANY APPLICANT IF IT DETERMINES THAT THE GRANTING OF SUCH LICENSE WOULD NOT BE IN THE PUBLIC INTEREST**

**15** | **VAWD Accreditation**

The National Association of Boards of Pharmacy's (NABP) Verified Accredited Wholesale Distributors (VAWD) accreditation is designed to protect the public from counterfeit drugs entering the U.S. drug supply.

Has your facility obtained VAWD accreditation?

❑ Yes   VAWD Accreditation number _____ Accreditation date _____

❑ No    Applied for VAWD Accreditation on _____

❑ No    Have not yet applied for VAWD Accreditation

**16** | **ATTESTATION OF REGISTRANT**

The undersigned affirms under penalty of perjury that the answers and statements that he/she has made in the above application are true and have been made and given with the intent of having the New York State Education Department and the New York State Board of Pharmacy rely on the truth thereof.

_William J. Scully_
Print Name

_William J. Scully_
Signature of registrant (Individual Owner, Partner, Corporate Officer, Member or *Other Authorized Person)

Date: _10_, _17_, _10_

_PRESIDENT_
Title

*Power of attorney must be submitted.

**17** | **ATTESTATION OF SUPERVISOR– PERSON NAMED IN ITEM 8**

I hereby certify that I have full knowledge of my responsibilities and will discharge these responsibilities to the best of my ability and that I am not the supervisor of any other establishment registered by the Board of Pharmacy.

_William J. Scully_
Print name

_William J. Scully_
Signature of Supervisor

Date _10_, _17_, _10_

**18** | Contact person to clarify information provided on this application.:

Name: _William J. Scully_

Telephone: _(516) 439-4974_

Fax: _(516) 437-4975_

E-mail: _LIAM@PHARMALOGICALINC.COM_

**NO FEE REQUIRED FOR CHANGE OF NAME**
**$170 FEE REQUIRED FOR CHANGE OF LOCATION**

**Mail this form and appropriate fee to:  New York State Education Department, Office of the Professions, Board of Pharmacy, 89 Washington Avenue, Albany, NY 12234-1000.  DO NOT SEND CASH.  Make check or money order payable to the New York State Education Department.**

The University of the State of New York
THE STATE EDUCATION DEPARTMENT
Office of the Professions
New York State Board of Pharmacy
89 Washington Avenue
Albany, NY 12234-1000
Phone 518-474-3817 ext 130
E-mail: pharmbd@mail.nysed gov

**Lawrence H. Mokhiber**
*Executive Secretary*

## M/W INFORMATION FORM

REGISTRATION NUMBER: _____

**PART I** (Print in Black ink)

(check one): ☐ Manufacturer   ☐ Repacker of Drugs   ☐ Repacker of Medical Gases   ☑ Wholesaler

**1** Name of owner/corporation under which registration has been issued or is sought:

M P H A R M A C O L O G I C A L   I N C

**2** Trade Name (if applicable):

**3** M/W Address:

Street and Number: 4 2 5   N O R T H E R N   B L V D
S T E   2 7
City: G R E A T   N E C K
State: N Y   County: N A S S A U
Zip Code: 1 1 2 0 1

**4** Complete **ONE** of the Following:

A. ☐ New Registration        Proposed date of opening: __ __ / __ __ / __ __ (mo day yr)

B. ☐ Transfer of Ownership   Proposed date of transfer: __ __ / __ __ / __ __ (mo day yr)

   Name of previous registrant: _____

   Registration number: _____

C. ☑ Change of location      Proposed Date of change: 1 / 0 1 / 1 0 (mo day yr)

   Previous address: *1010 NORTHERN BLVD GREAT NECK, NY. 11021*

D. ☐ Renovation             Proposed date of renovation: __ __ / __ __ / __ __ (mo day yr)

E. ☐ Update/Other _____

**5** Has the applicant applied for or been issued registration at any other location in this state by this department?   ☑ Yes   ☐ No

If yes, please list the address and registration number. Use additional paper if necessary.

*1010 NORTHERN BLVD GREAT NECK, NY 11021*           *029513*
Location and Address                                Registration Number

Does this applicant have a New York State registered pharmacy?   ☐ Yes   ☐ No

**6** List Supervisor of this establishment:

*William J. Seidly*

E

A1 : 3

**7.**  **A.**  Nature of registration:

☐ Manufacturer/wholesaler  ☐ Yes  ☐ No   ☑ Wholesaler only  ☑ Yes  ☐ No
☐ Repacker/wholesaler  ☐ Yes  ☐ No   ☐ Medical gas repackager  ☐ Yes  ☐ No

**B.**  Daily schedule of hours the establishment will be opened. (list days of week and hours opened.)

*8.5 M.F.*

**C.**  List percent of business done with the following (must equal 100%):

Domestic  *100*  %   Foreign _____ %

---

**8.**  Check **ALL** items distributed at this location.

☑ Prescription required drugs (human)  ☑ Medical Devices  ☑ Prescription required drugs (animal)
☑ Hypodermic syringes and needles  ☐ Controlled substances  ☐ Compressed medical gases/liquid
☐ Over the counter drugs  ☐ Cosmetics
☐ Other _____

---

**9.**  **Building/Space Requirements**

Has the following been adequately provided for? (check yes or no)

| | Yes | No |
|---|---|---|
| Adequate lighting | ☑ Yes | ☐ No |
| Appropriate sanitation | ☑ Yes | ☐ No |
| Adequate space | ☑ Yes | ☐ No |
| Necessary equipment | ☑ Yes | ☐ No |
| Appropriate security | ☑ Yes | ☐ No |
| Secure quarantine area | ☑ Yes | ☐ No |
| Orderly stock control | ☑ Yes | ☐ No |
| Free from insects, rodents, birds or vermin | ☑ Yes | ☐ No |
| Drug areas secure from unauthorized entry | ☑ Yes | ☐ No |
| Outside access well controlled and kept to a minimum | ☑ Yes | ☐ No |
| Outside perimeter well lighted | ☑ Yes | ☐ No |
| Alarm system for after hours | ☑ Yes | ☐ No |
| Security system against theft and diversion | ☑ Yes | ☐ No |
| Computer and electronic system security against theft and diversion | ☐ Yes | ☑ No |
| Temperature control | ☑ Yes | ☐ No |
| Humidity control | ☑ Yes | ☐ No |
| Written policies and procedures for distribution/recalls etc. | ☑ Yes | ☐ No |
| Hot and cold running water | ☑ Yes | ☐ No |

Recording equipment used for temperature/humidity (check each):

| | Yes | No |
|---|---|---|
| Manual | ☐ Yes | ☐ No |
| Electromagnetic | ☐ Yes | ☐ No |
| Electronic | ☐ Yes | ☐ No |

Neighborhood (check type):

| | Yes | No |
|---|---|---|
| Commercial | ☐ Yes | ☐ No |
| Residential | ☐ Yes | ☐ No |
| Both | ☑ Yes | ☐ No |
| Pharmacy Guide to Practice, Reference books, etc. | ☐ Yes | ☐ No |

---

**FOR MANUFACTURERS AND REPACKERS ONLY**

**10.**  **Supervision**

Will all manufacturing and/or repacking be done under the personal supervision of a licensed pharmacist?   ☐ Yes  ☐ No

Supervisor's who are not pharmacists shall meet the requirements as outlined in Section 63.6 (c)(1) of the regulations for registration and operation and of the establishments.

---

**11.**  Do you have storage or manufacturing facilities for drug products at an address other than that indicated?   ☐ Yes  ☐ No

If your answer is "Yes," indicated locations and explain:

_____

_____

_____

_____

_____

_____

EXHIBIT A



SUITE #27  —  735 RSF

425 NORTHERN BOULEVARD
GREAT NECK, NEW YORK

1/8" = 1' 0"



## PART III

Contact person to clarify information provided on this application:

Name: _William V Sevily_

Phone: _516 439-4974 / 917-930-9333_

Fax: _516 439-4975_

Email address: _LIAM@PHARMALOGICAL.INC.COM_

## PART IV: ATTESTATION

I affirm that all information submitted to the Board of Pharmacy is true. I am familiar with the Pharmacy Guide to Practice and the laws which govern the distribution of drugs and/or devices in New York State and with the Title 21 Code of Federal Regulations Part 205. I further understand that manufacturers, repackers and wholesalers may only sell drugs and/or devices to those purchasers authorized by law to receive them, and that records of the receipt and disposition of all drugs and/or devices shall be maintained for a period of five years and shall be available to the Department or any other authorized State or Federal agency for a period of not less than five years.

_(signature)_ _____     Date  _10/17/10_

Signature of applicant (Individual owner, partner, corporate officer, or "other authorized person")

_William V Sevily_     Date  _10/17/10_

Print Name

*Power of attorney must be submitted for "other authorized person"

## PART V: INSPECTION

Investigator's Comments:

_____

_____

_____

_____

_____

_____     Date _____

Signature – Investigator Office of Professional Discipline

_____

Print name